IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| HAROLD DAVIS,      )  | |
|     Petitioner,      ) | |
| ) | |
| v.      ) | No. 3:16-CV-1261-D |
| ) | |
| LORIE DAVIS, Director TDCJ-CID      ) | |
|     Respondent.      ) | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

This cause of action was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b), as implemented by an order of the United States District Court for the Northern District of Texas. The Findings, Conclusions and Recommendation of the United States Magistrate Judge follow.

**I. Procedural Background**

Petitioner filed this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. He challenges his conviction for capital murder. *State of Texas v. Harold Davis*, No. F-0960174 (292nd Jud. Dist. Ct., Dallas County, Tex., Feb. 4, 2013). Petitioner was sentenced to life in prison.

On May 1, 2014, the Fifth District Court of Appeals affirmed Petitioner's conviction and sentence. *Davis v. State*, No. 05-13-00200-CR, 2014 WL 1778269 (Tex. App. – Dallas, 2014, pet. ref'd). On September 17, 2014, the Court of Criminal Appeals refused Petitioner's petition for discretionary review. PDR No. 661-14.

On July 20, 2015, Petitioner filed a state petition for writ of habeas corpus. *Ex parte Davis*, Application No. 84,659-01. On March 30, 2016, the Court of Appeals denied the petition without written order.

On April 28, 2016, Petitioner filed this federal petition. He argues:

1. He received ineffective assistance of trial counsel when his attorney did not file any pretrial motions, did not conduct any pretrial preparation, conducted an inadequate cross-examination of witness William Glenn, failed to object to prejudicial testimony, and refused his speedy trial request;

2. There was insufficient evidence to support the conviction;

3. The trial court erred by denying the jury the opportunity to have two of the State's witnesses testify a second time; and

4. His arrest violated his right against warrantless search and seizure.

On September 23, 2016, Respondent filed her answer. On October 21, 2016, Petitioner filed a reply. The Court finds the petition should be denied.

## II. Factual Background

The following factual background is taken from the appellate court's opinion.

On the night of October 11, 2009, Kimheng Lay was shot and killed during a robbery at a convenience store on Harry Hines Boulevard in Dallas, Texas, at which he worked. For his alleged participation in the robbery that resulted in Lay's death, Davis was tried for capital murder. At Davis's trial, the jury heard the testimony of Lay's wife, Kimsreang Rugg. Just prior to the shooting of Lay, Rugg was on the phone with him. Rugg testified that Lay told her he knew "this guy is going to rob him." Rugg told Lay to give the money to the robber, and he did.

Kimleange Herndon, Rugg's cousin and Lay's employee, testified at trial. Herndon worked for Lay as a cashier, stocker, and cleaner at the convenience store. The night of October 11, 2009, Herndon was cleaning in the wine area of the store. An Hispanic male wearing a black jacket with the hood up and sunglasses approached her.

The man pulled a gun and told her to go to the cash register area and get money from the cash registers. Lay was at the cash register area and helped give the man the money from the registers. The man said he needed the money and "just give me the money." The man had a gun that was visible the entire time. After the man got the cash, and as he was leaving the store, Lay took out a gun. Herndon laid on the floor and was not able to see more of what transpired. She heard gunshots, and Lay fell to the floor. Herndon told the police after the incident that she believed Lay fired his gun before the robber fired his gun. Herndon called 911. She did not get a look at the person who was driving the car away from the scene or anything that happened outside the store.

William Glenn testified at trial. At around 11:00 p.m. on October 11, 2009, he had driven his brother-in-law, Anthony McCoy, to the convenience store to buy some beer. Glenn waited in his truck while McCoy went into the convenience store. McCoy knocked on the glass inside the store to get Glenn's attention. Glenn could not hear what McCoy was trying to tell him. Glenn got out of his truck and was able to hear McCoy telling him to call the police. Glenn called 9–1–1 and told the operator responding to that call that a robbery was taking place. While Glenn was on the phone, a man "fell out the front door" of the convenience store. When the man fell to the ground, a gun "kicked out," and the man reached out and grabbed the gun. The man crawled toward the street, and a car pulled up from the motel across the street, the passenger door of the car opened, and the driver of the car pulled the man into the vehicle. The car was a dark colored four door model. Glenn was able to identify the first two letters of the vehicle's license plate as "SP." Glenn gave this information to the police when they arrived at the scene. Glenn believes he told the police the vehicle was dark green.

Juan Green, who was incarcerated in the Dallas County Jail for a drug offense at the time of Davis's trial, testified. Green had known Davis for about seven years and knew Davis to own a Mercedes–Benz. Green testified that soon after October 11, 2009, Davis, nicknamed "Scooby," asked Green to clean Davis's Mercedes–Benz. When cleaning the vehicle, Green saw something "like cherry pie filling" on the passenger door. Green talked to Davis about his belief that someone had been eating food in and had soiled Davis's car. Davis "enlightened" Green that it was not food that Green saw in the car, but was, rather, "leg bits." Davis explained that there had been a "botched robbery" involving him and Rudy Bonilla. Davis told Green that Bonilla was supposed to go into the convenience store, wave his gun around, get the money, exit the store, and get into the car, and Davis and Bonilla would leave the scene. Davis told Green that when "doing" the robbery with Bonilla, Bonilla went into the store, Bonilla "tried to do too much," and the owner of the store shot at Bonilla. Davis told Green that Bonilla fired back and killed the store owner. The store clerk shot Bonilla in the leg, and Bonilla crawled out of the store. Davis had to drive his car around and pick up Bonilla. When Bonilla closed the car door, his injured leg contacted the car door leaving the residue from his injury that Green mistook for "cherry pie filling" when cleaning Davis's car.

Concerned that he had cleaned the vehicle used as the getaway car in the robbery Davis described, Green contacted the police and told them what he knew about the robbery. Within a few days of October 11, 2009, Green was interviewed by Dale Lundberg, a detective in the homicide unit of the Dallas Police Department.

Lundberg testified at trial. In the early hours of October 12, 2009, Lundberg responded to the convenience store crime scene. Lundberg testified Lay was shot twice and sustained injuries to his eye and his arm. Lay died at the scene.

The jury viewed photographs and videotapes from three of the security surveillance cameras at the convenience store, and Lundberg testified regarding those photographs and the contents of the videotapes. Videotape footage showed an individual in a blue shirt entering the convenience store. Lundberg later learned that individual was McCoy. An individual, later identified as Bonilla, is shown walking from the direction of the Cole Manor Motel, or from the direction of Empire Central Drive, into the convenience store. The videotape footage does not show Bonilla getting out of a vehicle. Bonilla was wearing sunglasses and a black hooded jacket with the hood pulled over his head. Bonilla entered the convenience store. Lay was behind the cashier's counter where the cash registers were located, an area located adjacent to the front door. Bonilla went to the area of the store where Herndon was working. He then forced Herndon at gunpoint to the cashier's counter. McCoy raised his hands in the air.

The video footage then showed that Bonilla moved behind the cashier's counter and aimed his gun at Lay. At gunpoint, Lay removed cash from the cash registers. Bonilla also removed cash from the cash registers. Bonilla then moved toward the front door. Lay pulled out a pistol. Lay fired his pistol twice at Bonilla. Bonilla fell, but pulled himself up. With his gun in his right hand, Bonilla aimed at where Lay was crouched. Lay's body jolted and moved upward slightly. Debris scattered on the countertop above Lay's head. Lay dropped to the floor. McCoy is shown on the videotape facing the parking lot making a gesture with his hand indicating that Glenn should make a phone call. Bonilla hobbled out of the store and then is seen crawling away from the store in the direction of the Cole Manor Motel. What appears to be headlights are visible in the top left-hand corner of the videotape footage. Those headlights appear to be across the street in the direction of the Cole Manor Motel or moving eastbound on Empire Central Drive. The videotapes do not show Bonilla getting into a vehicle after he left the convenience store.

Lundberg talked to Glenn at the scene. Glenn described seeing a four-door "Honda-like" vehicle that was "like the color of money" driving from the scene of the robbery. Glenn provided the first two digits of the vehicle's license plate as "SP." Glenn told the police that the first time he saw the vehicle, it was stopped at a traffic light at the intersection of Harry Hines Boulevard and Empire Central Drive, and the vehicle made a left turn at the intersection. Lundberg testified that the headlights seen on the

convenience store security surveillance videotape would be consistent with a car turning from Harry Hines Boulevard onto Empire Central Drive.

Lundberg testified that within a few days of the robbery, the Dallas Police Department received a lead in the case from an informant who said he knew the identity of one of the individuals involved in the convenience store robbery and where that individual was at the time. Based on this lead, Lundberg met with several individuals. One of the individuals, Randy Anderson, told Lundberg the location of a person he referred to as "Scooby," who Anderson had spoken with and knew was involved in this offense. Anderson also referred Lundberg to Heather Sims. Anderson said "Scooby" and Sims were at an apartment complex located in Grand Prairie, Texas. Lundberg went to that location and made contact with Sims. The police had been told drugs were being sold at the apartment complex, and Lundberg arranged to have undercover narcotics officers attempt to purchase drugs at that location in the hope that the person known as "Scooby" would offer to sell drugs to the undercover officers. The police could then obtain an arrest warrant and a search warrant for that location. However, that undercover narcotics plan was not successful.

A vehicle was located in the apartment complex parking lot that matched the description of the vehicle driving from the scene of the convenience store robbery. The vehicle was a dark-colored, two-door Mercedes–Benz. Lundberg testified that the vehicle is an unusual color, "kind of bluish-green," depending on the lighting. The vehicle's license plate number was SPR625. The license and registration established it was owned by Harold Davis and Angela Davis.

Lundberg testified that Davis voluntarily came out of his apartment, surrendered to the police, and was placed under arrest. Bonilla was arrested soon thereafter.

Dallas Police Department detective John Palmer testified at trial. Working in the homicide division of the department, Palmer was involved in the investigation of the case. Palmer arrested Bonilla at a storage unit in Grand Prairie, Texas. Bonilla had a gunshot wound to one of his thighs. Bonilla was charged with murder.

Palmer obtained consent from Davis to search Davis's 2002 Mercedes–Benz. Palmer interviewed Davis after his arrest, and the jury viewed excerpts of that interview. Davis stated he was known by the nickname "Scooby." Davis denied he was present at the robbery and denied driving his Mercedes–Benz at the scene of the robbery. Davis said Bonilla arranged to pay Davis for the use his car. Davis acknowledged he knew what Bonilla was going to do, and told Palmer that he allowed Bonilla to use his car. Davis acknowledged that his car was "implicated already," but Davis said no one could "put" him at the scene of the crime. Davis told Palmer that the "witnesses" who claimed to know about the crime being investigated were people at the apartment complex where Davis lived, but there was no one at the scene of the crime who could place Davis there.

Page -5-

Davis stated he knew he was implicated, or he would not have been at the police station being interrogated.

Davis said he knew Bonilla "got away with some money" from the robbery. Davis told Palmer that Bonilla was supposed to pay Davis, but he did not. Davis told Bonilla, "You are going to pay me or you are going to pay the hospital." Davis said Bonilla was "completely out of control," and Lay's death was a senseless murder. Davis said, "It went one way, turned out another way; I don't think nobody planned it to turn out the way it did." Davis told Palmer that he knew a lot more than what he was saying, but if it was not going to benefit him, "why should I say it?"

* * *

Sandra Lewis–Krick testified regarding the search and analysis of Davis's vehicle in her capacity as a crime scene analyst with the Dallas Police Department. Davis's blue-green colored Mercedes–Benz, with license plate number SPR625, was located in the Dallas Police Department pound. Lewis–Krick took swabs of a reddish brown stain located on the side of the front passenger seat near the door in order to perform testing to determine whether the stain was blood. The test indicated the stain was blood, but that particular test does not indicate whether blood is of human or animal origin, and the test can give a false positive for blood.

Alexander Nham, a forensic biologist with SWIFS, screens evidence for the presence of human bodily fluids. Nham was asked to perform tests on three swabs from Davis's Mercedes–Benz submitted by the Dallas Police Department. One of the swabs was labeled "outside front door," and the other two swabs were labeled "passenger side between seat and door." The swab from "outside front door" was positive for the presence of human blood. The swabs labeled "passenger side between seat and door" were presumptively positive for blood, however there was not enough sample in the swabs to perform a second test to confirm the presence of blood. Therefore, Nham conserved those samples for DNA analysis.

Angela Fitzwater, forensic biologist at SWIFS, testified. Her primary duty at SWIFS is DNA analysis. Evidence was submitted to Fitzwater for analysis: an autopsy blood standard from Lay, a buccal swab standard from Bonilla, and sample swabs from Davis's Mercedes–Benz labeled "outside front door" and "passenger between seat and door." The DNA profile obtained from the swab from "outside front door" was from a male and matched the DNA profile of Bonilla. One of the swabs from "passenger between seat and door" contained a very low level amount of DNA. Fitzwater was able to determine it was human DNA. The other "passenger between seat and door" swab also contained a low level amount of DNA, but Fitzwater was able to obtain a partial DNA profile. The partial DNA profile was from a male and matched the DNA profile of Bonilla. Fitzwater was not able to ascertain when the DNA contained on the swabs from Davis's Mercedes–Benz were left in the vehicle.

>    Davis was indicted for capital murder for his alleged involvement in the robbery that resulted in Lay's murder. The jury found Davis guilty of capital murder, and the trial court sentenced Davis to automatic life confinement. . . .

*Davis*, 2014 WL 1778269 at *1–5.

### III. Standard of Review

The pertinent terms of the Antiterrorism and Effective Death Penalty Act of 1996 (the AEDPA), 28 U.S.C. § 2254 provide:

> (d)  An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
>> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in a State court proceeding.

28 U.S.C. § 2254(d). Under the "contrary to" clause, a federal habeas court may grant the writ of habeas corpus if the state court arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or if the state court decides a case differently from the United States Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 380-84 (2000). Under the "unreasonable application" clause, a federal court may grant a writ of habeas corpus if the state court identifies the correct governing legal principle from the United States Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Id*.

    **2.**    **Procedural Bar**

Respondent argues Petitioner's third claim, that the trial court erred by denying the jury the opportunity to have two of the State's witnesses testify a second time, is procedurally barred because Petitioner failed to raise the claim in state court.

A federal court will ordinarily not review a claim where a petitioner has not presented his claim to the highest court of the state and the state court to which he would be required to present his claims would now find the claim procedurally barred. *See Coleman v. Thompson*, 501 U.S. 722, 729-31 (1991).

The record reflects that Petitioner failed to raise this claim in either a petition for discretionary review or his state habeas petition. Accordingly, the Texas Court of Criminal Appeals has not reviewed the claim. If this Court were to require Petitioner to return to state court to exhaust the claim, it would be subject to dismissal because it is too late for Petitioner to file a petition for discretionary review, and a second state habeas petition would be subject to an abuse-of-the-writ dismissal.

To overcome the procedural bar, a petitioner must demonstrate: (1) cause for the procedural default and actual prejudice as a result of the alleged violation of federal law; or (2) that failure to consider the claims will result in a "fundamental miscarriage of justice." *Pitts v. Anderson*, 122 F.3d 275, 279 (5th Cir. 1997) (citing *Coleman*, 501 U.S. at 750). Petitioner has shown no cause for his failure to present this claim to the Texas Court of Criminal Appeals.

Petitioner has also failed to demonstrate the need to prevent a miscarriage of justice. This exception is "confined to cases of actual innocence, 'where the petitioner shows, as a factual matter, that he did not commit the crime of conviction.'" *Fairman v. Anderson*, 188 F.3d 635,

644 (5th Cir. 1999) (quoting *Ward v. Cain*, 53 F.3d 106, 108 (5th Cir. 1995)).  To establish the required probability that he was actually innocent, a petitioner must support his allegations with new, reliable evidence that was not presented at trial and must show it was more likely than not that no reasonable juror would have convicted him in light of the new evidence.  *Id*. (citing *Schlup*, 513 U.S. at 327).  Petitioner has presented no new, reliable evidence showing that it was more likely than not that no reasonable juror would have convicted him.  Petitioner has not overcome the state procedural bar.  Accordingly, the procedural default doctrine bars federal habeas relief on this claim.

**3.     Ineffective Assistance of Counsel**

Petitioner claims he received ineffective assistance of counsel.  To sustain a claim of ineffective assistance of counsel, Petitioner must show that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense so gravely as to deprive Petitioner of a fair trial.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In *Strickland*, the Court stated that "[j]udicial scrutiny of counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight."  *Strickland*, 466 U.S. at 689.  Courts, therefore, must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id*.

Even if counsel is proven deficient, a petitioner must prove prejudice.  To prove such prejudice, Petitioner must show "a reasonable probability that the result of the proceedings would have been different but for counsel's unprofessional errors."  *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999) (citing *Strickland*, 466 U.S. at 694).  "[T]he mere possibility of a different outcome is not sufficient to prevail on the prejudice prong."  *Id*.  "Rather, the defendant must

demonstrate that the prejudice rendered sentencing 'fundamentally unfair or unreliable.'" *Id*. (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)).

Petitioner claims he received ineffective assistance of counsel when counsel failed to file pre-trial motions and failed to conduct a proper pre-trial investigation by not interviewing witnesses or checking alibis. Petitioner, however, has failed to state what pre-trial motions his counsel should have filed, which witnesses he should have interviewed, which alibis he should have checked, and how any of this evidence would have been favorable to the defense. Petitioner's conclusory allegations should be denied. *See Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983) (emphasizing that mere conclusory allegations do not raise constitutional issues in habeas proceedings).

Petitioner also claims his counsel failed to adequately cross-examine witness William Glenn, who Petitioner states changed his prior statement regarding the night of the incident. Petitioner does not specify how Glenn changed his testimony. The record shows Detective Lundberg testified that the police report said Glenn told officers that the first time he saw the suspect's car, it was stopped at a light on Harry Hines Boulevard. (ECF No. 9-7 at 78.) The convenience store was located on the corner of Harry Hines Boulevard and Empire Central. On cross-examination by defense counsel, Glenn stated he did not remember telling police that he first saw the suspect's car on Harry Hines Boulevard. (*Id*. at 34.) Instead, Glenn stated he first saw the car when it came from a motel across the street from the convenience store. (*Id*. at 30-31.) Petitioner has failed to show how further cross-examination of where Glenn first saw the suspect's car would have benefitted the defense. Defense counsel established that at the time of

trial, Glenn did not remember first seeing the car on Harry Hines Boulevard.  This claim is without merit.

Petitioner states his counsel failed to object to Detective Lundberg's testimony that officers attempted to make an undercover drug buy from Petitioner at his apartment so they could obtain a search warrant for the apartment.  (ECF No. 9-7 at 74.)  Petitioner claims this testimony unlawfully portrayed him as a drug dealer.  Officer Lundberg, however, testified that undercover officers were not successful in obtaining drugs from Petitioner.  (*Id.*)  Petitioner has failed to show that but for his counsel's failure to object to this testimony, there is a reasonable probability that the verdict would have been different.

Petitioner claims his counsel failed to raise a speedy trial claim.  The Sixth Amendment guarantees a defendant "the right to a speedy and public trial." U.S. CONST. AMEND. VI.  The record shows Petitioner was indicted on November 6, 2009, and his trial began on January 30, 2013.  The record also shows that the prosecutor and defense counsel agreed to each continuance of the trial date.  (*See* docket sheet at  www.dallacounty.org.)  The pass slips show that the parties continued Petitioner's trial until after his co-defendant's trial was completed.  (*Id.*)  Defense counsel may have waited until after the co-defendant's trial was completed so that the defense would know what the evidence and witness testimony would be prior to Petitioner's trial. Petitioner has failed to show that his counsel's conduct fell outside of reasonable trial strategy. *See Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992).

**4.      Insufficient Evidence**

Petitioner argues the evidence was insufficient to support the conviction. Petitioner claims his co-defendant did not intend to kill the decedent, and that the killing was accidental. He argues he therefore should not have been charged or convicted of capital murder.

A federal court may not disturb a conviction in a state criminal proceeding unless no rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Gibson v. Collins*, 947 F.2d 780, 781 (5th Cir. 1991). The evidence must be viewed in the light most favorable to the verdict. *Jackson*, 443 U.S. 319; *Gibson*, 947 F.2d at 781.

Petitioner raised his insufficiency claim on direct appeal. The court stated:

> The jury may infer the intent to kill from the defendant's acts, words or conduct, *Hall v. State*, 418 S.W.2d 810, 812 (Tex. Crim. App. 1967)(quoting *Kincaid v. State*, 150 Tex.Crim. 45, 198 S.W.2d 899, 900 (Tex. Crim. App. 1946)), see also *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (intent may be inferred from circumstantial evidence such as acts, words, and conduct of accused), and from any facts in evidence it believes prove the existence of that intent, such as the use of a deadly weapon. *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003). If the record supports conflicting inferences, we must presume that the fact finder resolved the conflicts in favor of the prosecution and defer to that determination. *See Jackson*, 443 U.S. at 326. . . .
>
> . . . On appeal, Davis argues that it can be inferred from the videotape footage showing Bonilla crawling outside the store and the upward angle of the trajectory of the bullet in Lay's arm, that Bonilla was on the floor of the convenience store when his gun discharged. Davis further argues that Bonilla firing two shots in quick succession indicates Bonilla's weapon inadvertently discharged. Davis contends these arguments belie a reasonable jury finding Bonilla intentionally shot Lay.
>
> The specific intent to kill may be inferred from the use of a deadly weapon, unless the manner of its use makes it reasonably apparent that death or serious bodily injury could not have resulted. *Flanagan v. State*, 675 S.W.2d 734, 744 (Tex. Crim. App. 1984) (op. on reh'g); *see also* TEX. PENAL CODE ANN. § 1.07(a)(17)(a) (West Supp.2013) ("deadly weapon" means "a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury"). "Naturally, the most obvious cases and the easiest ones in which to prove a specific intent to kill, are those

>cases in which a firearm was used and was fired or attempted to have been fired at a person." *Godsey v. State*, 719 S.W.2d 578, 581 (Tex. Crim. App. 1986). If a deadly weapon, such as a pistol, is used in a deadly manner, an intent to kill is presumed. *Livingston v. State*, 739 S.W.2d 311, 337 (Tex. Crim. App. 1987); *see also Adanandus v. State*, 866 S.W.2d 210, 215 (Tex. Crim. App. 1993) (intent to kill may be inferred from use of a deadly weapon in a deadly manner); *Womble v. State*, 618 S.W.2d 59, 64 (Tex. Crim. App. [Panel Op.] 1981) ("In fact, where a deadly weapon is fired at close range and death results the law presumes an intent to kill."); *Thompson v. State*, 521 S.W.2d 621, 622 (Tex. Crim. App. 1974) (pistol is a weapon deadly per se when fired at a victim at close range).
>
>   Here, the evidence is undisputed that Bonilla brandished a gun while robbing the convenience store. The jury viewed the convenience store videotape footage showing Bonilla forcing Herndon at gunpoint to the front of the store, McCoy raising his hands when he saw Bonilla holding a gun, and Bonilla pointing his gun at Lay while Lay emptied the cash registers. Bonilla pointed his gun at Lay and shot him twice at close range. Lay died as a result of the gunshot wound to his head, and that wound inflicted at close range could demonstrate deliberateness. Considering the evidence, including the sequence of events depicted on the videotape footage, the jury could reasonably infer Bonilla acted with the required mental state at the time of the shooting. *See Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996) (stating jury may infer intent to kill from use of a deadly weapon unless it would not be reasonable to infer that death or serious bodily injury could result from use of weapon).

Davis, 2014 WL 1778269 at *6-7.

Although Petitioner argues that Bonilla did not intentionally kill Lay, viewing the evidence in a light most favorable to the verdict, the Court finds Petitioner has failed to show that state court's denial of this claim was unreasonable.

**5.   Search and Seizure**

Petitioner claims his arrest and the seizure of his car were unlawful because officers did not have a warrant. A federal court may not grant habeas relief based on a Fourth Amendment violation where the state has provided an opportunity for full and fair litigation of the issue. *Stone v. Powell*, 428 U.S. 465, 493-95 (1976). The Fifth Circuit has held that "an opportunity for full and fair litigation" means just that – an opportunity. *Caver v. Alabama*, 577 F.2d 1188, 1192

(5th Cir. 1978). "If a state provides the processes whereby a defendant can obtain full and fair litigation of a fourth amendment claim, *Stone v. Powell* bars federal habeas corpus consideration of that claim whether or not the defendant employs those processes." *Id*.; *see also Janecka v. Cockrell*, 301 F.3d 316, 320 (5th Cir. 2002). A habeas petitioner must plead and prove that the state court proceeding was inadequate in order to obtain post-conviction relief in federal court. *Davis v. Blackburn*, 803 F.2d 1371, 1372 (5th Cir. 1986).

In this case, Petitioner has failed to allege or show that he did not have a full and fair opportunity to litigate his Fourth Amendment claims in state court. This claim should be denied.

**6.   Summary**

Petitioner is lawfully restrained because he has failed to prove that he has been denied a constitutionally protected interest. Accordingly, the state courts' decision to deny relief is not contrary to or does not involve an unreasonable application of clearly established federal law and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

**IV.  Recommendation**

For the foregoing reasons, the Court recommends that Petitioner's habeas corpus petition pursuant to 28 U.S.C. § 2254 be denied with prejudice for failure to make a substantial showing of the denial of a federal right.

Signed this 19th day of June, 2017.

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).